## Frankfort & Cincinnati Railroad Company v. Marshall.

## Same v. New Hampshire Fire Insurance Company.

(Decided November 21, 1930.)

BRADLEY & BRADLEY and FOWLER, WALLACE & FOWLER for appellant.

FORD & FORD for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming.

These two suits were instituted to recover damages for the setting out of a fire by an engine of the appellant, Frankfort & Cincinnati Railroad Company. In the court below the suits were consolidated, tried as one, and in this court have been treated as one appeal.

The appellee Marshall lost a tobacco barn and certain items of personal property contained therein and he recovered a judgment for $2,653.50. When the Marshall barn burned, the fire was communicated to an outbuilding on an adjoining lot owned by Ernest Hutchinson. This outbuilding was insured by the appellee, New Hampshire Fire Insurance Company, which paid Hutchinson for the loss to his building and took an assignment of his cause of action under a subrogation provision of the policy of insurance. The insurance company then instituted an action against the appellant to recover the amount paid by it, alleging the same grounds of negligence as were set out in the petition in the Marshall case.

Appellant argues as grounds for reversal that the verdict is flagrantly against the weight of the evidence and that the instructions are erroneous.

The appellee A. T. Marshall owns a farm which is located just east of the city limits of Georgetown in Scott county. This farm adjoins the right of way of the Frankfort & Cincinnati Railroad Company, and the barn in question was distant about 20 feet north from the

appellant's right of way. The fire occurred April 27, 1929, and was discovered about 5:45 p. m. On this point there is no dispute. About fifteen minutes before the fire was discovered, one of appellant's freight trains passed the barn going east. The barn was located about 900 feet east of the point where appellant's railroad crosses the tracks of the Cincinnati, New Orleans & Texas Pacific Railway Company. As appellant's tracks approach the Cincinnati, New Orleans & Texas Pacific Railway Company's tracks going east, there is a slight upgrade, and then for a distance of 400 feet its tracks are level. From a point 500 feet west of the barn to a point 1,700 feet east of it appellant's tracks are slightly downgrade going east.

A. T. Marshall testified that on the afternoon of the fire as he was returning to his home from Georgetown, he saw the appellant's train as it crossed the Cincinnati, New Orleans & Texas Pacific Railway Company's tracks traveling in the direction of his barn. He went to his home, left his automobile, and walked down to the barn, which was about 250 feet away. He went in the barn, fed some hogs, and then walked outside. While he was standing in the barn lot, an electric passenger car traveling east on appellant's tracks stopped and the motorman informed him that his barn was on fire. He ran back in the barn and discovered a fire in the roof about 2 feet square. The fire was in the third bent from the west end of the barn and on the south side of the barn next to the railroad and at that time was confined to the roof.

Albert Vaughn, a neighbor, testified that as he walked east from Georgetown along appellant's right of way just after the freight train passed and near the point where appellant's tracks cross the tracks of the Cincinnati, New Orleans & Texas Pacific Railway Company, the grass was burning on appellant's right of way north of its tracks.

Robert True, whose lot adjoins appellant's right of way on the north, just east of the Marshall barn, was in his back yard and saw the train as it approached the Marshall barn. As the train passed his premises the furnace door of the engine was open and the fireman was throwing in a shovel of coal. His testimony in narrative form is as follows: ''The sparks began to roll out—the wind was very strong, and blowing from the south—and come out of the smokestack this way. The smoke flushed

out black and strong and sparks thick flying with it, plenty of sparks flying, and the engine chugged pretty hard with the throttle open to make the grade ahead. The sparks fell on the north side of the railroad track. The sparks continued to roll out until they passed Mr. Marshall's barn, and I stood in my tracks and watched it when it made the grade, made the bend, under the little overhead bridge, before I left. I watched it continually until it made this heavy grade, and when it passed Mr. Marshall's barn I could see from where I was standing, could see the top of the barn and the side of the roof, eight or ten feet, that much of the roof I could see, the wind blowing strong, which wind struck this roof and glanced up that way as it passed the barn. I saw the smoke strike on the top part of this barn and glance off. I could see the sparks very plainly. It was sundown. They began to fly out just as it passed Mr. Whitton's house next door. It was way on beyond Mr. Marshall's that I noticed the sparks still flying.''

Mrs. Ella Cook, whose home was near the railroad track and near the barn, testified that she saw the train pass just before the fire and that the engine was emitting large quantities of sparks and that her rear porch was covered with hot cinders. Mrs. Jessie Fryman, who was a passenger on the electric passenger car, which followed the freight train east to Paris from Georgetown, and which left the station at Georgetown 12 minutes after the freight train left, testified that she saw the grass on appellant's right of way on fire at three or four points between Georgetown and Centerville, which is a few miles east of Georgetown.

A number of other witnesses testified that they saw sparks emitted by the engine as it passed along on the evening in question. Two or three witnesses testified that when they first observed the fire it was in the roof of the barn.

The appellant introduced a number of witnesses, including the motorman on the electric car, who was the first to discover the fire, who testified that their attention was called to the fire by smoke escaping from the barn and that they saw no fire in the roof at that time. Appellant also introduced evidence to the effect that appellant's engine was equipped with a standard spark arrester which was in good condition and properly adjusted and had been inspected at Frankfort, Ky., on the day of the fire.

408

The cause of the fire was a question of fact to be determined from circumstances shown if those circumstances formed a reasonable basis for such determination. The verdict of the jury that the fire was caused by sparks from the locomotive cannot be held to be without reasonable support in the evidence. The plaintiffs' evidence fairly negatived any other source from which the fire could have come. A case not unlike this in principle and analogy of circumstances is Louisville & Nashville Railroad Co. v. Rains, 230 Ky. 132, 18 S. W. (2d) 954, except for some testimony in the latter case that the sparks which caused the fire were emitted by the engine while it was on an ascending grade. It was held that the evidence was sufficient to justify a submission of the case to the jury and to sustain the verdict. So, here, we find that the evidence tending to show the fire was started by sparks emitted by appellant's engine was so substantial that the question was fairly for the jury to determine whether that was the cause of the fire, and that the court did not err in submitting that question. Big Sandy & Kentucky River Railway Co. v. Allen, 222 Ky. 527, 1 S. W. (2d) 964. The evidence introduced by appellant tending to show that the spark arrester on the engine was in good condition and properly adjusted is not conclusive of the question of negligence on the part of the railroad company. This made an issue for the jury. Louisville & Nashville Railroad Co. v. Rains, supra; Illinois Cent. Railway Co. v. Nuckols, 212 Ky. 564, 279 S. W. 964; Louisville & Nashville Railroad Co. v. Hobbs, 188 Ky. 291, 221 S. W. 539.

By instruction No. 1 the court told the jury that it was the duty of the railroad company to equip its engine with the best and most effectual screen or spark arrester known to science and in practical use and to keep the same in good order and properly adjusted, so as to prevent as far as possible sparks of fire from escaping therefrom. It is insisted that this instruction is erroneous because it places a greater duty on the railroad company than is placed thereon by section 782 of Kentucky Statutes, which reads: "All companies shall place in, on or around the tops of the chimneys or engines, a screen fender, damper or other appliance, that will prevent, as far as possible, sparks of fire from escaping from such chimneys." This statute has been frequently construed by this court in substantially the language of the given instruction. In Louisville & Nashville Railroad

Co.· v. Burley Tobacco Society, 147 Ky. 22, 143 S. W. 1040, 1044, the court in approving the instructions said: "The instructions, singly and collectively, presented the law of the case as warranted by the evidence under the pleadings as fully and fairly as appellant was entitled to have them." While the instructions given in that case are not set out in the opinion, we have examined the record and find that instruction No. 1 given in this case is precisely the same as the instruction defining the duty of the railroad company with reference to spark arresters given in the Burley Tobacco Society case.

The instruction on the measure of damages for the loss of the barn is also criticized. It reads: "If the jury should find for the plaintiff under Instruction No. 1 it should award him in damages the fair and reasonable value of the barn so destroyed, as it was when and where destroyed by said fire not to exceed for said barn the sum of $3004." It is not contended that the value of the building when destroyed is not the correct measure of damage, but it is insisted that its value to that particular farm as located on that farm is the correct measure, and that the jury should have been told that the actual location of the barn on that farm was an element to be considered in fixing the damage. The phrase, "as it was when and where destroyed," presented that matter with sufficient clarity.

Finding no error in the judgment appealed from, it is affirmed.